UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WISCONSIN

DOC NO.
REC'D/FILED

2018 FEB 16  AM 10: 10

PETER OPPENEER
CLERK US DIST COURT
WD OF WI

JAMES L. KIRK,

        Plaintiff,

   -vs-

LIZZIE TEGELS, sued in her
official capacity, TAMMI
MAASSEN, W. BRAD MARTIN,
DEBRA TIDQUIST, CHERYL
MARSOLEK, KRISTINE PRALLE,
GEORGIA KOSTOHYZ, CHERYL
MIDDLETON, MIR R. SUBLA,
SAMPOORNIWA SETTY, MICHAEL
WITCIK, CHIH-SHENG J. CHIANG,
JOHN DOE (SONOGAPHER: MR),
WARD M. BROWN, sued in their
individual capacities,

        Defendants.

CIVIL ACTION - COMPLAINT

CASE NO. **18 C 110**

JURY TRIAL DEMANDED

## I. PRELIMINARY STATEMENT

1.   This is a civil rights action, brought by a state prisoner under 42 U.S.C. § 1983, for damages and injunctive relief, alleging denial of medical care for plaintiff's heart, in violation of the Eighth Amendment to the United States Constitution, for deliberate indifference to the plaintiff's serious medical needs.

2.   Due to defendants' actions and inactions, plaintiff did not receive timely diagnosis and treatment for his cardiac chest pains, and it resulted in severe pain, and severe permanent damage to his heart. Defendants' continue to cover-up and conceal the true nature of plaintiff's heart and medical condition, therefore, denying him proper diagnosis and treatment for his ongoing cardiac medical condition.

## II. JURISDICTION

3.     This Court has jurisdiction over the subject matter of this Complaint under 42 U.S.C. § 1983 and 28 U.S.C. §§ 1331, 1343(a)(3), 1343(a)(4), and 1367(a).

## III. PARTIES

4.     The plaintiff, James L. Kirk, was incarcerated at Jackson Correctional Institution (JCI), in Black River Falls, WI, during the events described in this Complaint.

5.     Defendant Lizzie Tegels, is the Warden at JCI, who is employed by the State of Wisconsin to work for the Wisconsin Department of Correction (WI DOC), she is sued in her official capacity, for injunctive relief only.

6.     Defendant Tammi Maassen, is the Health Services Unit (HSU) Supervisor. She is employed by the State of Wisconsin to work at the WI DOC at JCI, at all times relevant to this Complaint. She is sued in her individual capacity.

7.     Defendant W. Brad Martin, is a Medical Doctor, employed by the State of Wisconsin to work for the WI DOC at JCI, at all times relevant to this Complaint. He is sued in his individual capacity.

8.     Defendant Debra Tidquist, is a Nurse Practitioner, employed by the State of Wisconsin to work for the WI DOC at JCI, at all times relevant to this Complaint. She is sued in her individual capacity.

9.     Defendant Cheryl Marsolek, is a Registered Nurse, employed by the State of Wisconsin to work for the WI DOC at JCI,

-2-

at all times relevant to this Complaint. She is sued in her individual capacity.

10.    Defendant Kritine Pralle, is a Registered Nurse, employed by the State of Wisconsin to work for the WI DOC at JCI, at all times relevant to this Complaint. She is sued in her individual capacity.

11.    Defendant Georgia Kostohyz, is a Registered Nurse, employed by the State of Wisconsin to work for the WI DOC at JCI, at all times relevant to this Complaint. She is sued in her individual capacity.

12.    Defendant Cheryl Middleton, is a Registered Nurse, employed by the State of Wisconsin to work for the WI DOC at JCI, at all times relevant to this Complaint. She is sued in her individual capacity.

13.    Defendant Mir R. Subla, is a Medical Doctor and a Cardiologist. He is/was employed by Gundersen Lutheran Medical Center, Inc., whose address is 1900 South Avenue, LaCrosse, WI 54601. He was acting as an agent, servant, and/or employee of the WI DOC, at all times relevant to this Complaint. He is sued in his individual capacity.

14.    Defendant Sampoornima Setty, is a Medical Doctor, and a Cardiologist. He is/was employed by Gundersen Lutheran Medical Center, Inc., whose address is 1900 South Avenue, LaCrosse, WI 54601. He was acting as an agent, servant, and/or employee of the WI DOC, at all times relevant to this Complaint. He is sued in his individual capacity.

-3-

15.   Defendant Michael Witcik, is a Medical Doctor, and a Cardiologist. He is/was employed by Gundersen Lutheran Medical Center, Inc., whose address is 1900 South Avenue, LaCrosse, WI 54601. He was acting as an agent, servant, and/or employee of the WI DOC, at all times relevant to this Complaint. He is sued in his individual capacity.

16.   Defendant Chih-Sheng J. Chiang, is a Medical Doctor. He is/was employed by Gundersen Lutheran Medical Center, Inc., whose address is 1900 South Avenue, LaCrosse, WI 54601. He was acting as an agent, servant, and/or employee of the WI DOC, at all times relevant to this Complaint. He is sued in his individual capacity.

17.   Defendant John Doe (Sonographer: MR), is a Sonographer. He is/was employed by Gundersen Lutheran Medical Center, Inc., whose address is 1900 South Avenue, LaCrosse, WI 54601. He was acting as an agent, servant, and/or employee of the WI DOC, at all time relevant to this Complaint. He is sued in his individual capacity.

18.   Defendant Ward M. Brown, is a Medical Doctor, and a Cardiologist. He is/was employed by Black River Falls Memorial Hospital, whose address is 711 West Adams Street, Black River Falls, WI 54615. He was acting as an agent, servant, and/or employee of the WI DOC, at all times relevant to this Complaint. He is sued in his individual capacity.

19.   All defendants acted in concert and conspiracy and were jointly and severally responsible to the harms caused to plaintiff.

-4-

## IV. FACTUAL ALLEGATIONS

21.    Plaintiff went to Dodge Correctional Institution (DCI), on 8-5-15. Previously to that, plaintiff was under the care of Dr. Michael Papp, DO, Cardiologist, who had plaintiff's medication regimen well controlled. Plaintiff was okay at walking short to medium distances, while fatique was low, comforatable at rest, and light activities.

22.    When plaintiff went to DCI, they changed plaintiff's medication regimen, completely removing plaintiff's diuretic, (water pill).

23.    On 10-20-15, Defendant Martin prescribed a diuretic for plaintiff, but plaintiff still complained of shortness of breath.

24.    On 11-10-15, Defendant Martin ordered an Echocardiogram (ECG), for heart failure follow-up, and a history of Myocardial Infarctions, with stent placement, for plaintiff.

25.    On 11-23-15, plaintiff was seen by Defendant Martin to review the ECG. The plaintiff's ECG showed a Left Ventricle Ejection Fraction (LVEF%) of 40%. Plaintiff had no complaints of chest pain.

26.    On 12-30-15, plaintiff was seen by Defendant Tidquist, plaintiff was still complaining of shortness of breath with activity.

27.    On 1-27-16, plaintiff was seen by Defendant Brown, at Black River Falls Memorial Hospital, for a cardiac consult.

28.    On 2-1-16, Defendant Brown's recommendations were followed as to plaintiff's medication regimen. Defendant Tidquist

-5-

discontinued Dyazide, started Lasix 10 mg. Increased Carvedilol to 6.25 mg. 2 x daily, and increased lisinopril to 10 mg. Defendants Martin or Tidquist never contacted Dr. Papp to see where the plaintiff's medication regimen was at before incarceration.

29.  On 3-3-16, plaintiff was seen by Defendant Kostohyz for shortness of breath. She told plaintiff "he was not having difficulty breathing." Plaintiff said "he could breathe better before the DOC started tampering with his medication regimen." Defendant Kostohyz sent plaintiff back to the housing unit.

30.  On 6-4-16, plaintiff was seen by Defendant Marsolek for shortness of breath. She set plaintiff up an appointment to see a provider.

31.  On 6-6-16, plaintiff was called to HSU by Defendant Tidquist for shortness of breath. She doubled plaintiff's Carvedilol to 12.5 mg. 2 x daily. She said if plaintiff still has problems, she said Defendant Brown said we could run some tests including a stress test.

32.  On 6-21-16, plaintiff went to see Defendant Martin for periodic chest pains and shortness of breath. Defendant Martin increased plaintiff's Lisinopril to 20 mg. a day, from 10 mg. a day.

33.  On 7-13-16, plaintiff was seen by Defendants Kostohyz and Marsolek, for shortness of breath and worsening chest pains. They did an Electrocardiogram (EKG) on plaintiff.

34.  Defendant Kostohyz said that there was "no blockages," that plaintiff's chest pains was caused by "old age." Defendant

Marsolek said the chest pain may be caused by "the weather."

35.     Defendant Kostohyz said plaintiff's wheelchair author-
zation for distances was recinded, and she said he did not need a
cane either. She asked plaintiff "who gave him the cane?" Plaintiff
said he has shortness of breath and spine problems too.

36.     Defendant Marsolek told the defendant to go back to the
housing unit, despite plaintiff telling her that he still had chest
pains.

37.     Despite what Defendants Kostohyz and Marsolek said, among
other things the EKG taken on 7-13-16 said "inferior infarct," and
"consider ischemia."

38.     The Medical Dictionary describes "inferior infarct," to
say "an undersurface area of tissue in a heart that undergoes
necrosis following cessation of the blood supply. This may result
from occlusion or stenosis of the supplying artery." In layman's
terms, "dead heart tissue because of a blockage or blockages."

39.     The medical dictionary describes "consider ischemia,"
to mean "to deliberate upon; examine, deficient supply of blood
to the heart that is due to obstructions to the inflow of arterial
blood (as by the narrowing of arteries by spasm or disease." In
layman's terms, a "blockage," or "blockages."

40.     This directly contradicts what Defendants Kostohyz and
Marsolek said. They sent plaintiff back to the housing unit with
painful blockages, refusing to disclose the true nature of the EKG.

41.     On 7-14-16, plaintiff was called up to HSU to meet with
both Defendants Martin and Tidquist. Defendant Martin reluctantly

-7-

extended plaintiff's wheelchair authorization for a month. Plaintiff told them both he was hurting bad right above his heart, like when he had blockages in the past.

42.   Defendant Tidquist asked the plaintiff if it hurts when he lifts his left arm up or when he presses on his chest? Plaintiff said it's hurting really bad right now, right above his heart, like the blockages for the other 3 heart attacks.

43.   Plaintiff asked if he could be placed on the heart transplant list. Defendant Martin said plaintiff had an ejection fraction of 40%, considered mild and easily treated. The plaintiff said the chest pains were becoming unbearable, and be begged them to take him to the hospital. They refused.

44.   Defendants Martin and Tidquist did not tell the plaintiff of the results of the EKG taken one day before, that the EKG stated that there was "dead heart tissue" and "blockages."

45.   Defendants Martin and Tidquist lectured plaintiff about the dangers of smoking, and set him up for a lung test, spirometry test. Plaintiff told them that there was absolutely nothing wrong with his lungs. Defendant Martin increased plaintiff's Lasix to 20 mg. from 10 mg. They sent plaintiff back to the housing unit with the same chest pains that he came with.

46.   On 7-19-16, plaintiff put in a request for HSU telling them he was still having chest pains, and still had difficulty breathing. He attached a Finding of Facts and Conclusions of Law from his SSI determination, to help describe where he is at with his medical issues, as far as his heart's concerned.

-8-

47. On 7-20-16, Defendant Marsolek called plaintiff down to HSU. Defendant Marsolek was angry. She asked plaintiff what was the significance of the Finding of Facts and Conclusions of Law?

48. Plaintiff told her that the way that HSU has been treating his Congestive Heart Failure, and he did not think that HSU contacted his regular Cardiologist, Dr. Papp, this document describes the condition of his heart, since HSU was not treating him for his chest pains.

49. Defendant Marsolek angrily asked plaintiff "you've been complaining about chest pains for months, what do you want me to do about it?"

50. Plaintiff replied "send me to a hospital." Defendant Marsolek said "we're not going to do it."

51. Defendant Marsolek took part in taking the EKG that was taken a week earlier, saying the plaintiff had "dead heart tissue" and "blockages."

52. Defendant Marsolek was angry and sent plaintiff back to his housing unit, without so much as taking plaintiff's vitals.

53. Defendant Marsolek did not find anybody else to treat plaintiff for his severe chest pains.

54. On 7-26-16, plaintiff's Mother, Mrs. Gwendolyn J. Kirk, called up to HSU from Tennessee, and requested somebody take her son to the hospital, and told them of his history of heart attacks, and a stroke.

55. Defendant Pralle called plaintiff up to HSU. She took plaintiff's blood pressure, listened to his heart and lungs,

-9-

checked his ankles for swelling, and made plaintiff blow through a tube.

56.     Plaintiff told Defendant Pralle that he was having bad chest pains, and he has a history of heart attacks.

57.     Plaintiff told Defendant Pralle that he knows something is wrong with his heart, not lungs, and that he needs to go to the hospital, or at least a cardiologist.

58.     Defendant Pralle called Defendant Tidquist and asked her if she could give the plaintiff Nitro. Defendant Tidquist said no. Defendant Pralle said everything we did came back negative, we did a blood test that said that your heart is not failing.

59.     The plaintiff said he has never went to the hospital complaining of chest pains, and they did a blood test, and sent him home with the same chest pains that he went there with.

60.     Defendant Pralle diagnosed plaintiff's chest pains as Angina or COPD. She sent plaintiff back to the housing unit with the same chest pains that he came there with.

61.     On 7-28-16, Defendant Tidquist sent plaintiff to Black River Falls Memorial Hospital for a Spiometry test. The results of the Spirometry test did 'not' show COPD. The results showed "mild" obstructive pulmary defect. Mild, not Chronic.

62.     On 8-10-16, Defendant Tidquist called plaintiff up to HSU. She said "just as Dr. Martin and I suspected, you have COPD."

63.     Plaintiff said "it's my heart that is hurting, not my lungs." Defendant Tidquist said "we're going to try this inhaler, the nurse will show you how to use it."

-10-

64.     Plaintiff said Defendant Brown said "we could try some other tests, including a stress test." Defendant Tidquist said "thats why we are trying this."

65.     Defendant Tidquist said "try your inhaler, and we'll see you again in a month." The plaintiff said "if I live that long, it's my heart that is hurting, not my lungs." Defendant Tidquist sent plaintiff back to his housing unit with the same chest pains he came up to HSU with.

66.     The next day, on 8-11-16, I was called up to HSU by Defendant Middleton for a lab draw, which was ordered by Defendant Tidquist. Plaintiff asked what was this for?

67.     Defendant Middleton said it was for some kind of stomach flu (H. Pylori antigen), that produces bile. Defendant Middleton asked plaintiff if he was spitting up bile?

68.     Plaintiff said "no, this is just another attempt to blame [plaintiff's] chest pains on something else and try to justify not taking [plaintiff] to the hospital for [his] cardiac issues."

69.     The H. Pylori antigen results were negative. Plaintiff never complained of "stomach flu" symptoms.

70.     On 8-13-16, plaintiff wrote Defendant Maassen and asked her if he could get permanent wheelchair authorization, because he was disabled through SSI, and his heart was not going to get any better. Plaintiff told her so he can participate in everyday activites like non-disabled people do.

71.     Defendant Marsolek intercepted the note, wrote back and

-11-

said "you do not meet the criteria for a wheelchair."

72.    On 8-22-16, plaintiff wrote a request to HSU telling them "I have Congestive Heart Failure, and Coronary Artery Disease. I am still having chest pains right above my heart, and right in the middle, now my left arm is starting to hurt, and my legs feel weak. It's not my lungs or stomach flu - the inhaler doesn't help my chest pains at all. They are getting worse."

73.    On 8-23-16, Defendant Middleton called plaintiff up to HSU. She asked plaintiff where his pain was?

74.    The plaintiff told her right above his heart, and in the middle of his chest. She asked front or back? Plaintiff said both, it is radiating to his left arm, upper arm, inside and outside.

75.    Defendant Middleton said "what would you like me to do for you?" Plaintiff said "send me to the hospital." She said "what do you think they would do at the hospital we couldn't do for you here?"

76.    Plaintiff said "they have better diagnostic equipment than a blood pressure cuff and a stethoscope."

77.    Defendant Middleton then said "they would do the same thing as they do here." Plaintiff said "I haven't ever went to the emergency room complaining of chest pains and they did nothing and sent me back home with the same chest pains I was complaining of."

78.    Defendant Middleton just said she was going to see if she could get an appointment with the Nurse Practioner (Defendant Tidquist), faster.

-12-

79.   Defendant Middleton sent the plaintiff back to the housing unit with the same chest pains he came to HSU with.

80.   On 8-28-16, plaintiff was seen by Defendant Pralle. Plaintiff submitted a request on 8-27-16, saying "That Spiriva don't help. I still have real bad chest pains, it hurts my left shoulder and arm still. My legs continue to tingle, the pain is caused by my heart, not lungs. My chest hurt even worse after I walked to HSU. I need my wheelchair back. I need to go to the hospital for my chest pains."

81.   Defendant Pralle took plaintiff's blood pressure and listened to his chest. Plaintiff signed a refusal for Spiriva, it did not work, and it made his chest hurt real bad to walk to HSU.

82.   On 9-6-16, plaintiff came out of the housing unit bathroom, and was experiencing severe chest pains and lightheadedness, and fell to the ground. He was taken by ambulance to Black River Falls Memorial Hospital, then subsequently flown by helicopter to Gundersen Lutheran Medical Center, Inc.

83.   Plaintiff was immediately taken to the Cath Lab, where he was given a cardiac catheterization.

84.   When the procedure was completed, either Defendant Setty or Defendant Subla personally told plaintiff "I undid a lot of blockages."

85.   Plaintiff is not sure of which one told him that, because plaintiff was unable to obtain a report of either one of them. No report of the angiography, who undid the blockages, and who filmed the procedure. There should be a report of the surgery.

-13-

86.    The papers that plaintiff received says Defendant Setty is the "Diagnostic Cardiologist," where the 3 photocopies the plaintiff obtained, says "Perf: Subla, Mir Rauf, MD VD11B 150915."

87.    On 9-7-16, Defendant John Doe (Sonographer: MR), came to plaintiff's hospital room to do a Transthoracic Echocardiographic Report (ECG). In the middle of the procedure, he stopped. He went and called Defendant Witcik to see if he could inject contrast into plaintiff, so he could obtain a better image of plaintiff's heart.

88.    Defendant Doe (Sonographer: MR), told plaintiff he and the cardiologist agreed not to inject contrast in plaintiff because the IV had already been taken out. This is covering up and concealing the true nature of the damage to plaintiff's heart, and the true nature of his medical condition under the guise of "the IV had already been taken out."

89.    Defendant Doe (Sonographer: MR), did not list the LVEF% on the paper copy of the ECG that the plaintiff received. This is one of the main purposes of an ECG.

90.    Defendant Doe (Sonographer: MR), quickly finished the procedure, Defendant Chiang told plaintiff he has an ejection fraction of 40%, no permanent damage to his heart, Defendant Witcik agreed and signed off on it, then they quickly released plaintiff.

91.    On 9-7-16, upon plaintiff's arrival back at the institution, Defendant Pralle and plaintiff looked over the paperwork that the hospital sent back with the plaintiff.

92.    Defendant Pralle looked at a photocopy of plaintiff's entire heart, with a dark spot in the upper left hand corner.

-14-

93.    Defendant Pralle said about the dark spot "that must have been where the blockages were."

94.    On 9-8-16, Defendant Tidquist called plaintiff up to HSU to discuss plaintiff's condition. Plaintiff told Defendant Tidquist that they opened up blockages, and plaintiff's chest pain was gone.

95.    Defendant Tidquist denied that there was blockages in plaintiff's heart, despite the 7-13-16 EKG, and the photocopies of the blockages, taken in the angiography.

96.    On 9-21-16, Defendant Tidquist again called plaintiff up to HSU, for a follow up for chest pain. Plaintiff told defendant Tidquist that his ears were ringing real bad, he was having headaches, and his feet and hands were going to "sleep" when he laid on his side or stomach, since the blockages were undone.

97.    Defendant Tidquist said "no, no, they didn't do anything. All they did was start you on Imdur, they didn't do anything."

98.    The plaintiff said "are you going to deny all of this?" Defendant Tidquist replied "no, they didn't do anything, just started you on a new medication." She sent plaintiff back to his housing unit.

99.    Plaintiff was supposed to go to Gundersen in one month for a follow up with a Nurse Practioner in Cardiology, which was confirmed by Defendant Maassen in a note dated 9-23-16.

100.    Defendant Tidquist did not take plaintiff back to Gundersen so plaintiff could identify which Cardiologist

-15-

unblocked the blockages and obtain a report, so he could also find
out why the cardiologist did not want the Sonographer to inject
contrast in him when doing the ECG, find out why the ejection
fraction was not listed on the paper copy of the ECG taken on
9-7-16. Also, find out why Defendant Chiang said "no intervention
was performed," and why he said "no significant change in wall
motion abnormalties compared to previous echo," and how much dam-
age was really caused, among other questions.

101.   Instead of Defendant Tidquist taking plaintiff back
where they did the cardiac catheterzation, and the ECG, so he
could get the answers he was seeking from the people who did the
procedures, and find out the true nature of his medical condition,
she decided to change the appointment from Gundersen to Defendant
Brown, where he was not involved with any part of plaintiff's
care at Gundersen.

102.   The only thing Defendant Brown said at the 9-28-16 appoint-
ment is that plaintiff did not need any other angioplastys or by-
passes.

103.   Defendant Brown did not tell plaintiff how he had a
"depressed" ejection fraction (lower than 40%), he said nothing
about more diagnostic testing and treatment, he did not tell plain-
tiff how he had "diffuse hypokenesis of the left ventricle. Infe-
rior wall looks thinned and possibly scarred," he said nothing about
"abnormal (paradoxical) motion consistent with left bundle branch
block."

104.   Defendant Brown said nothing to plaintiff about "Impaired

-16-

relaxation pattern of LV diastolic filling," or how a Cardioverter/ Defibrillator may help the plaintiff with his depressed ejection fraction, or the true nature of the plaintiff's medical condition.

105. Plaintiff was telling Defendant Brown how he lays on his stomach or side, and his arms and legs go numb, and how he gets headaches, and bad ringing in his ears, and how he is so fatiqued all of the time.

106. Defendant Brown said this is caused by your back, as he was headed out of the door. He just left right in the middle of plaintiff's exam.

107. Plaintiff obtained Defendant Brown's report dated 9-28-16, where he stated "He does note his heart is 'pounding' when he is recumbent at night lying on his side."

108. Plaintiff said nothing about his heart is "pounding" when he is lying on his side.

109. This is an attempt by Defendant Brown to cover up and conceal the true nature of plaintiff's medical condition.

110. Plaintiff was having trouble with his gallbladder, and had to have it removed. Dr. Darrin Antonelli, MD, Gastroenterologist had to see if plaintiff's heart was strong enough for the operation.

111. When he looked on the computer at plaintiff's medical records, he listed in his report dated 5-12-17, that "The last echocardiogram showed a dismal ejection fraction of 28%." This would be the ECG taken on 9-7-16.

112. This directly contradicts Defendant Chiang's Resident

-17-

Report where he stated plaintiff's ejection fraction is 40%, where it was not listed on the paper copy of the ECG. 28% would be more consistent with plaintiff's poor circulation.

113.   Plaintiff had an ingrown toenail removed on 8-22-17, by Defendant Martin.

114.   Plaintiff's toe had become infected, where Defendant Tidquist prescribed Minocycline 100 mg. 2 x daily for 10 days, on 11-13-17. It did not heal the toes.

115.   On 11-27-17, plaintiff wrote a request to HSU telling them he still has ringing in his ears and poor circulation since the 9-6-16 angiography which is keeping his toe from healing. Nurse LaBarbera set plaintiff up to see a provider.

116.   On 12-10-17, plaintiff put in a HSU request saying his hearts been hurting the last couple of days, he still has ringing in his ears, and poor circulation. He don't know if the infection in his toes is going to his heart or what, but its been hurting.

117.   Defendant Pralle called plaintiff up to HSU on 12-11-17, to verify plaintiff was not having a heart attack, then informed him he would be seeing Defendant Martin the next day.

118.   On 12-12-17, Defendant Martin called plaintiff up to HSU. He said "you're allergic to tetanus vaccine, anything else?" Plaintiff said "no."

119.   Plaintiff asked him if we could do an ECG and a stress test to see why his circulation was so poor, the ringing in his ears was terrible, his ankles hurt so bad, and his hands and feet were going to "sleep." Also, the chest pains were getting bad, and

-18-

plaintiff is so fatiqued.

120.   Defendant Martin prescribed Clindamycin 300 mg. 3 x daily, for 10 days. He told plaintiff we did not need to do a stress test and an ECG, and to go wait in the waiting room for his antibiotics.

121.   Defendant Martin did not address any of the plaintiff's other issues. He did not even listen to plaintiff's heart or ask plaintiff about his chest pains.

122.   Plaintiff went back to the housing unit after receiving his antibiotics, with the same chest pains and complaints that he came to HSU with.

123.   On 12-21-17, Nurse Cecelia Hutchenson-Smith, RN, called plaintiff up to HSU, without plaintiff putting a request in.

124.   Nurse Smith did not take plaintiff's vitals. She asked how the plaintiff's toes were doing, and if plaintiff had diarrhea. Plaintiff told her the toes were a little better, and he almost had diarrhea.

125.   Plaintiff told her that all his symptoms were getting worse because of the medication. Chest pains were getting way worse, ringing in the ears was worse, hands and feet going to "sleep" worse, plaintiff was super fatiqued. Plaintiff's ankles so bad it is hard for him to go to sleep. It is making plaintiff's heart failure way worse.

126.   Nurse Smith just told plaintiff to keep taking the Clindamycin, even though plaintiff was having a bad reaction to it. She never even took plaintiff's vitals, or set him up an

-19-

appointment to see a provider even though plaintiff was complaining about having an adverse reaction to the medication.

127.   Nurse Smith sent the plaintiff back to the housing unit with the same chest pains and symptoms he went to HSU with.

## V. SUPERVISORY LIABILITY

128.   The plaintiff has exhauseted his Administative Remedies. He tried to take care of each one of the issues with HSU Super-visor, Defendant Tammi Maassen, to no avail. Defendant Maassen did not help plaintiff get diagnostic testing, treatment for any of the plaintiff's issues, or go to the hospital.

129.   Plaintiff wrote to Defendant Maassen on the following dates: 7-7-16, lack of competent medical care, she did nothing, left the care up to Defendants Martin and Tidquist, in a note dated 7-20-16.

130.   On 7-20-16, plaintiff wrote to Defendant Maassen about Defendant Marsolek refusing medical treatment to plaintiff. Def-endant Maassen ignored the letter.

131.   On 7-31-16, when plaintiff's mother called up to HSU, Defendant Maassen refused to take the call or call her back. She said there was a Spiromety test scheduled in a letter dated 8-3-16, she did nothing about plaintiff's complaints about chest pains.

132.   On 8-13-16, plaintiff wrote Defendant Maassen requesting wheelchair authorization. The letter was intercepted by Defendant Marsolek, and said plaintiff did not qualify for a wheelchair, it was on the same request form dated 8-13-16.

-20-

133.  On 8-23-16, plaintiff wrote about Defendant Middleton not providing care for plaintiff's chest pains, or send him to a hospital. Defendant Maassen said Defendant Middleton 'assured' plaintiff it was not needed, in a response dated 8-31-16.

134.  On 9-1-16, plaintiff wrote Defendant Maassen and told her he had bad chest pains and Defendant Pralle said the plaintiff did not need hospital care because he was able to ambulate (walk), in a letter dated 9-19-16.

135.  On 9-20-16, and 9-21-16, plaintiff wrote Defendant Maassen and told her about the cover-up of all the doctors at Gundersen, and Defendant Tidquist, agreeing with the Resident doctor, Defendant Chiang, saying plaintiff had no blockages. In letters dated 9-23-16 and 10-5-16, Defendant Maassen said plaintiff should address the issues at Gundersen when he returns for a follow up. She said one has been scheduled. Defendant Tidquist then re-scheduled plaintiff not to go to gundersen, but go to Black River Falls Memorial Hospital to see Defendant Brown.

136.  On 10-1-16, and 10-3-16, plaintiff wrote Defendant Maassen trying to get the photocopy of plaintiff's whole heart with the dark spot in the upper left hand corner which Defendant Pralle and the plaintiff looked at when plaintiff returned from Gundersen on 9-7-16. Defendant Maassen did not reply.

137.  On 10-7-16, plaintiff wrote Defendant Maassen that Defendant Brown is covering up the true nature of plaintiff's medical condition, and said that the plaintiff's symptoms were caused by his back, and left the exam room in the middle of the exam.

-21-

Defendant Maassen did not reply.

138.  On 11-15-17, plaintiff wrote Defendant Maassen telling her that Defendant Tidquist fabricated an entire physical without plaintiff being there. Defendant Maassen did not reply.

139.  Defendant Maassen maintains a custom or policy of denying inmate patients adequate medical care in violation of the Eighth Amendment to the United States Constitution.

### VI. PLAINTIFF'S PREVIOUS MEDICAL CONDITION

140.  The left ventricle is the hardest working part of the heart. This is the ventricle that pushes the blood through the entire body, which is called the "Left Ventricle Ejection Fraction percentage." Average is 55%.

141.  When the plaintiff had his previous myocardial infarctions, or "heart attacks," he quickly got to the hospital each time, minimizing the permanent damage from ischemia, or the deficient supply of blood to the heart due to obstruction of the inflow of arterial blood.

142.  Defendant Brown, in his report dated 1-27-16, which was signed on 2-3-16, listed in part, as plaintiff's past medical history, as to the ECG obtained on 11-16-15 as:

143.  Revealed mildly dilated left ventricle with mildly reduced global systolic function, with ejection fraction estimated to be 40%. There was an akinetic inferno lateral segment. Diastolic dysfunction was noted. Mild left atrial enlargement was seen. No gross valvular abnormaly was discerned.

### VII. PLAINTIFF'S CURRENT MEDICAL CONDITION

144.   After complaining, for approximately 10 weeks, of chest pains, with known blockages for approximately 7 weeks, plaintiff fell to the ground with severe chest pains and lightheadedness. This severely damaged plaintiff's heart.

145.   The EKG taken on 7-13-16, said "consider ischemia."

146.   When ischemia is transient (brief), it may be associated with angina pectoris; when it is prolonged (like plaintiff's), it can lead to myocardial necrosis and scarring with or without the clinical picture of acute myocardial infarction.

147.   Plaintiff had ischemia, blockages and chest pains, for approximately 10 weeks, that he was complaining about.

148.   After the angiography, and the blockages were removed, plaintiff's heart was severely damaged.

149.   Among other things, the 9-7-16 ECG said "Diffuse hypo-kenesis (widespread diminished or abnormally slow movement) of the left ventricle. Inferior wall looks thinned and possibly scarred."

150.   Also, "Abnormal (paradoxical) motion consistent with left bundle branch block." [A left bundle branch block can block the electrical impulses and cause the heart to beat abnormally].

151.   The 9-7-16, ECG goes on to say "Impaired relaxation pattern of left ventricle diastolic filling."

152.   The plaintiff's ejection fraction is a "dismal 28%," this is a "depressed" ejection fraction, putting it in another, lower, catagory from the claimed 40%, "preserved" ejection fraction, indicating more diagnostic testing and treatment.

-23-

153. As Defendant Doe (Sonographer: MR), wanted to inject contrast into plaintiff so he could get a clearer image of plaintiff's heart, there may be more damage than listed.

154. An ejection fraction of 28% would require further diagnostic testing, and treatment. With the depressed ejection fraction, and hypertrophy in the left ventricle, the plaintiff's heart may have undergone "ventricle remodeling," warranting further treatment. Plaintiff needs to have 'current' diagnostic testing to assess the real damages to plaintiff's heart.

155. Plaintiff's regular Cardiologist found that plaintiff was a Class III of the New York Heart Association Classification (NYHA Class III) system. Plaintiff was stable, and his medication regimen was working good for him.

156. Plaintiff could walk short to medium distances, comforatable at rest with some light activity. He could sleep well at night.

157. Plaintiff is currently feeling chest pains, his whole body goes numb, his ankles hurt to the point that it keeps him awake at night. His hands and feet go to "sleep" constantly. His ears ring constantly. He is fatiqued  even at rest, with periodic headaches and lightheadedness.

158. Plaintiff has been living with the emotional distress that the defendants are just leaving him here to die, and providing him no healthcare whatsoever. Plaintiff worries that his children and grandchildren would be devastated by his unnecessary and needless death at 53 years of age, just so the DOC could save money.



## VIII. DEFENDANTS' VIOLATION OF PLAINTIFF'S
## CONSTITUTIONAL RIGHTS AND DEFENDANTS'
## VIOLATION OF THEIR DUTY OF CARE TO PLAINTIFF

159.  As a result of the defendants' actions and inactions, plaintiff's heart condition was greatly aggravated and thus caused plaintiff substantially more harm than it would have had defendants acted consistent with generally accepted medical standards of care and conducted the physical examination and diagnostic imaging called for under such standards of care.

160.  The harms to plaintiff described above were the direct and proximate results of the failure by defendants to properly diagnose and timely treat plaintiff's heart condition.

161.  At all relevant times, defendants were aware of plaintiff's serious medical needs and failed, with deliberate indifference, to ensure that plaintiff received needed evaluation and treatment.

162.  As a direct and proximate result of the conduct of all defendants was willful, reckless, callous, and malicious, disregarding plaintiff's rights under federal and state law.

163.  As a direct and proximate result of the conduct of all defendants, plaintiff suffered, and continues to suffer physical and psychological harm, pain and suffering, some or all of which may be permanent, and may cause his untimely death.

## IX. CLAIMS FOR RELIEF

WHEREFORE, plaintiff respectfully requests that the Court grant the following relief:

A.    Issue an injunction ordering the defendants to not

have contact with plaintiff, or to provide plaintiff with medical care (except Defendant Tegels);

B.  Order the Warden of JCI, Defendant Tegels, to transfer plaintiff to an independent Cardiologist, medical provider, order the defendants not to have contact with the independent provider, let the independent provider fully diagnose plaintiff's heart and medical condition, and provide whatever treatment is in the plaintiff's best interest and medically necessary;

C.  Compensatory damages to all defendants, except Defendant Tegels;

D.  Punitive damages to all defendants, except Defendant Tegels:

E.  Reasonable attorneys' fees and costs to all defendant, except Defendant Tegels; and

F.  Such other and further relief as may appear just and appropriate.

Plaintiff hereby demands a jury trial.

2-13-18

Date

James L. Kirk #119291
Jackson Correctional Institution
P.O. Box 233
Black River Falls, WI
              54615-0233

-26-