IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

JAMES L. KIRK,

                              Plaintiff,

      v.

TAMMI MAASSEN, W. BRAD MARTIN,
DEBRA TIDQUIST, CHERYL MARSOLEK
AND GEORGIA KOSTOHYZ,

                              Defendants.

OPINION AND ORDER

18-cv-110-bbc

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

      Plaintiff James Kirk filed this lawsuit pro se, contending that he was denied adequate treatment for a serious heart condition while incarcerated at Jackson Correctional Institution. I granted plaintiff leave to proceed on claims under the Eighth Amendment, and recruited counsel to represent him.

      Now before the court is defendants' motion for summary judgment, in which they argue that plaintiff cannot prove his claims. Dkt. #45. Plaintiff responds that there are disputed issues of fact and that he should be given additional time to find an expert to support his claims. However, plaintiff has not identified any factual disputes that are material to his claim. He also does not suggest that he has identified an expert that would support his claim, or that there is any issue on which expert opinion would change the outcome of this case. Zaya v. Sood, 836 F.3d 800, 806-07 (7th Cir. 2016) ("By itself an expert's assessment that a treatment decision was unreasonable is not enough to establish conscious disregard of a known risk."). Based on the undisputed evidence, I

1

conclude that plaintiff cannot show that defendants acted with deliberate indifference to his heart problems. Accordingly, I will grant defendants' motion and close this case.

I note that plaintiff has filed several recent letters and documents with the court, complaining about the performance of his counsel. He argues that counsel should have amended his complaint to include claims regarding the medical treatment he received after he was transferred from Jackson Correctional Institution, in 2019 and 2020. He alleges that individuals from the Department of Corrections, Bureau of Health Services, and other facilities have conspired to deprive him of adequate medical care for his heart condition. But this case is about the medical care that plaintiff received from the named defendants at Jackson. It is not likely that I would have permitted plaintiff to amend his complaint to include new claims against new defendants, as that would have greatly expanded the scope of the case and would have required the court to set a new schedule. If plaintiff thinks that recent care he has received has violated his constitutional rights, he may file a new lawsuit. However, as discussed below, plaintiff cannot succeed on a medical care claim under the Eighth Amendment by asserting, without evidence, that he is being denied treatment that he wants. To succeed, he must show that the defendants' treatment was "blatantly inappropriate" and amounted to "so significant a departure from accepted professional standards or practices that it calls into question whether the doctor actually was exercising his professional judgment." Pyles v. Fahim, 771 F.3d 403, 408 (7th Cir. 2014).

From the parties' proposed findings of fact and the record, I find the following facts to be undisputed unless otherwise noted.

UNDISPUTED FACTS

A. The Parties and Background

Plaintiff James L. Kirk was housed at Jackson Correctional Institution during the time period relevant to this case, from September 25, 2015 through June 12, 2018. Defendants all worked at Jackson during the relevant time period: Dr. W. Brad Martin (physician, now deceased); Debra Tidquist (advanced nurse prescriber); Tammy Maassen (health services unit manager); Cheryl Marsolek and Georgia Kostohyz (nurse clinicians).

Plaintiff has a history of serious health problems, including high blood pressure, diabetes, multiple heart attacks and ischemic cardiomyopathy. (Ischemic cardiomyopathy means that the heart's ability to pump blood is decreased because the heart's left ventricle is enlarged, dilated and weak. This is caused by ischemia, which is a lack of blood supply to the heart muscle that may be caused by coronary artery disease and heart attacks. Tidquist Decl., dkt. #48, ¶ 15.) Before he was incarcerated, plaintiff's health problems were well-controlled with medication, and he was able to walk without significant fatigue, he was comfortable performing light activities and he slept well at night.

B. Plaintiff's Intake at Dodge Correctional Institution

Plaintiff was transferred from a county jail to Dodge Correctional Institution in August 2015. At Dodge, plaintiff underwent an initial health screening, and prison staff completed a health transfer summary for him. The health transfer summary stated that plaintiff had high blood pressure, diabetes, ischemic cardiomyopathy and an "ejection

fraction" of 35-40%. (Ejection fraction measures the percentage of blood leaving the heart each time it contracts. An ejection fraction above 50-55% is considered normal; 40-50% is slightly below normal; 35-39% is moderately below normal; and less than 35% is severely below normal. Tidquist Decl., dkt. #48, ¶ 14.) Plaintiff was using several medications for his heart condition, including aspirin; carvedilol (an alpha and beta blocker used to treat high blood pressure and heart failure); furosemide (a dirutetic that is used to treat high blood pressure and to reduce extra fluid in the body); gabapentin (a nerve pain medication); potassium chloride (a mineral supplement used to treat or prevent low amounts of potassium in the blood); lisinopril (an ACE inhibitor used to treat high blood pressure and heart failure); and simvastatin (a statin used to treat high cholesterol).

Plaintiff's file stated that he had seen a cardiologist in June 2015. Dodge staff attempted to obtain plaintiff's records from that visit, but were unable to do so.

C. Plaintiff's Care at Jackson Correctional Institution

1. 2015

On September 29, 2015, plaintiff was transferred from Dodge Correctional Institution to Jackson Correctional Institution. Plaintiff's prescription medications were transferred with him.

Plaintiff saw defendant Dr. Martin on October 20, 2015 for a hypertension evaluation. Plaintiff complained to Martin that he was having shortness of breath. Martin noted that plaintiff had had three heart attacks since 2005, had a stent placement, and had

4

been given a diagnosis of congestive heart failure. Martin noted that an echocardiogram might be warranted, as plaintiff reported that his ejection fraction had been down to 17% in the past. (An echocardiogram is a test used to assess the overall function of the heart, detect the presence of certain types of heart disease, and assist in the evaluation of heart disease over time.) Martin ordered chest and lumbar spine x-rays, labs, diuretic medications, and a follow-up appointment in one month. The results of the x-rays showed chronic interstitial changes in the lungs but no acute cardiopulmonary process.

Throughout the rest of October and November 2015, plaintiff complained to health services staff that he was having shortness of breath, labored breathing and chest pain. On November 10, Dr. Martin referred plaintiff for an echocardiogram. Martin noted that the x-ray results had shown some pulmonary fibrosis, which is scarring or damage to the lung tissues, that could be causing plaintiff's breathing problems. The echocardiogram results indicated a 40% ejection faction, suggesting mild to moderate heart failure. On December 16, 2015, defendant Tidquist, an advanced nurse prescriber, prescribed carvedilol to plaintiff.

Tidquist saw plaintiff on December 30, 2015 to review the results of his echocardiogram with him. Plaintiff complained that he was still having trouble breathing and that he had shortness of breath with activity. Plaintiff's blood pressure was 109/77, which Tidquist thought was evidence that his heart was functioning well. Plaintiff's oxygen was 95%, suggesting that he was receiving adequate oxygen. But because plaintiff continued to complain about shortness of breath and activity intolerance, Tidquist decided to refer

5

plaintiff for an offsite cardiology consult. She also ordered a CT scan of his abdomen because he complained about abdominal pain.

2. <u>2016</u>

On January 27, 2016, plaintiff had an offsite cardiology consultation with Dr. Ward Brown at Black River Memorial Hospital. Plaintiff described his symptoms and reported that he had been on a successful medication regimen before he was incarcerated. Brown noted that the etiology of plaintiff's shortness of breath was uncertain, and that it was "possibly a manifestation of heart failure-like process." Brown reviewed plaintiff's medications and recommended that plaintiff's carvedilol be increased over time. Brown also recommended that plaintiff continue taking an ACE inhibitor, and that he should start taking a loop diuretic, with further evaluation and treatment depending on the results of the recommendations.

On February 1, Tidquist ordered a loop diuretic for plaintiff and discontinued his previous diuretic. She also ordered lisinopril and carvedilol for another year, with a follow-up appointment in three months. The following week, Tidquist increased plaintiff's carvedilol dose per Dr. Brown's recommendation to titrate up the dosage.

On March 3, 2016, plaintiff saw defendant Nurse Kostohyz for complaints of difficulty breathing. Plaintiff reported that he had breathed more easily before his medication regimen was changed. Kostohyz noted that plaintiff's medications had been changed recently and that he had a follow-up appointment scheduled with his doctor.

Kostohyz recommended that plaintiff rest between activities, take his medications as ordered and submit a health service request if he did not have improvement. (In her notes, Kostohyz wrote that plaintiff was breathing easily and in no distress at the appointment, but plaintiff denies that he was breathing easily. He says that Kostohyz told him that he should return to the housing unit because he was not having breathing problems.)

On April 26, 2016, plaintiff saw defendant Nurse Marsolek for complaints of swollen hands and shortness of breath. He was also seen by a nurse practitioner who noted no rashes and no shortness of breath. He was given Benadryl and was educated on signs of allergy.

On June 4, plaintiff saw Nurse Marsolek again for complaints of shortness of breath. Marsolek noted that plaintiff was not in respiratory distress and that his breathing level was within normal limits. Plaintiff asked for an appointment with a provider, and he was seen by Tidquist on June 6. Plaintiff complained to Tidquist of chest pain and shortness of breath, and stated that his chest pain and shortness of breath had worsened since his medication was changed. Tidquist ordered an increase in carvedilol per Dr. Brown's recommendation. Tidquist noted that plaintiff should be scheduled for a follow-up visit in two weeks, and that consideration should be given to an increased dose of lisinopril if he was still having symptoms. Tidquist also noted that additional diagnoses might be considered. Two weeks later, on June 21, plaintiff saw Dr. Martin, and Martin increased plaintiff's lisinopril dose.

Plaintiff continued to complain about chest pain, back pain and shortness of breath throughout July and August 2016. He saw Nurse Kostohyz on July 13. (Plaintiff says that

7

he also saw Marsolek on that day.)  Plaintiff's blood pressure and heart rate were normal, his oxygen level was in the normal range and his lungs were clear.  Kostohyz concluded that it was not an emergency situation.  She requested a neurologist consult for plaintiff's back pain and discontinued his wheelchair so that he would walk more, which, in her judgment, would be better for his back pain and assist with weight control.

An electrocardiogram was ordered.  (It is not clear from the record whether Kostohyz or someone else ordered the electrocardiogram.)  The results showed abnormalities, including an "inferior infarct" and potential ischemia.  (Plaintiff says that the results showed that he had suffered a heart attack, but he cites no evidence to support his interpretation of the results.)  As nurses, neither Kostohyz nor Marsolek has the authority to interpret the electrocardiogram results.  (According to plaintiff, Kostohyz told him that the results were normal and that his chest pain was caused by old age.  He says that Marsolek told him that his chest pain may be caused by the weather.  Defendants Kostohyz and Marsolek deny that they spoke to plaintiff about his electrocardiogram results.)

Plaintiff saw defendants Martin and Tidquist the next day, on July 14, 2016. Plaintiff told Martin and Tidquist that he was having chest pain, similar to the pain he had felt before his previous heart attacks.  He begged to be taken to the hospital and asked to be placed on a waiting list for a heart transplant.  Martin and Tidquist declined to send plaintiff to the hospital.  (Plaintiff also says that they refused to discuss plaintiff's electrocardiogram results with him, but defendants deny this.)  Martin noted that it was difficult to determine whether plaintiff's shortness of breath was a cardiac or pulmonary matter, particularly

8

because plaintiff had been a smoker for more than 20 years. Martin ordered a spirometry test, which is a pulmonary function/breathing test. He also increased the dose of plaintiff's loop diuretic and extended his wheelchair for 30 days.

On July 19, plaintiff submitted information from the Social Security Administration regarding his heart issues. The next day, he saw Nurse Marsolek with complaints of chest pain and shortness of breath. Marsolek asked plaintiff about the information he had provided from the Social Security Administration. Plaintiff responded that health services had failed to contact his outside cardiologist and had not been treating his chest pain and congestive heart failure properly. Plaintiff said he should be sent to the hospital, and he threatened to file a lawsuit. (Marsolek alleges that plaintiff was angry and speaking loudly, but plaintiff denies this.) Marsolek asked plaintiff to calm down and lower his voice. She then asked him to leave. Marsolek did not perform an examination, but noted that plaintiff had upcoming lab appointments with a provider and a spirometry test scheduled.

Plaintiff received the spirometry test from an outside pulmonologist on July 28, 2016. After the testing, the pulmonologist concluded that plaintiff likely had a mild obstructive pulmonary defect, for which a bronchodilator might be helpful. Tidquist saw plaintiff on August 10 for a follow-up visit after receiving the spirometry results. Tidquist assessed him as having mild obstructive pulmonary disease, coronoary artery disease, hypertension, dyslipidemia and epigastric pain. Tidquist ordered an albuterol inhaler (a bronchodilator), which she thought would assist plaintiff with his complaints of shortness of breath. She also ordered an H. Pylori test, to test for bacteria to determine if he might have an ulcer causing

his epigastric pain. Plaintiff insisted that his heart, not his lungs, was causing his problems. Plaintiff refused to use his inhaler consistently.

Plaintiff continued to complain about chest pain, left arm pain and leg pain throughout August 2016. He asked to be sent to the hospital on multiple occasions, but health services staff declined to send him. He stated that his chest pain had worsened since he had been given an inhaler.

On September 6, 2016, plaintiff fell to the ground after experiencing severe chest pain and lightheadedness. He was taken to the emergency room at Black River Medical Hospital, where an electrocardiogram indicated left bundle branch block. He was then flown to Gundersen Lutheran Medical Center in La Crosse and was kept overnight for observation. The next day, plaintiff underwent a cardiac catheterization and angiography which showed the left anterior descending artery was open. The procedure showed chronic total obstruction of a coronary artery with "collateralization," meaning that new vessels had formed to permit blood flow, and that the situation was long-standing, not a new acute condition. The cardiologist did not perform any interventions. (Plaintiff states that the surgeon removed blockages during the procedure, but he cites no evidence to support his assertion.) The attending cardiologist assessed plaintiff's condition as unstable angina and congestive heart failure. Plaintiff's troponin level suggested that he did not have a heart attack. His ejection fraction was 40%, which was consistent with his prior measurements. Plaintiff was given isosorbide mononitrate, which resolved his chest pain.

On September 8, Tidquist discussed the hospital discharge notes with plaintiff. He

stated that the cardiologist had opened blockages that had relieved his chest pain. Tidquist told plaintiff that no blockages had been opened, and that the physicians had prescribed nothing beyond a new medication.

On September 14, 2016, Dr Martin ordered isosorbide mononitrate to prevent and treat his chest pain. On September 21, plaintiff complained to Tidquist of ringing in his ears, headaches, and numb hands and feet when lying on his side or stomach. Plaintiff insisted that he had multiple vessels that required opening. Tidquist told plaintiff that the angiography showed no blockages that required intervention.

On September 28, plaintiff had an offsite cardiology consultation with Dr. Brown at Black River Memorial Hospital. Brown advised Kirk that there was nothing going on with his heart that required further angioplasties.

3. <u>2017</u>

On April 21, 2017, a non-DOC medical doctor recommended an echocardiogram to check plaintiff's ejection fraction and cardiac function. Tidquist placed the order for the echocardiogram. The echocardiogram results showed left ventricular ejection fraction at 68%, which was an improvement from the prior year. An ultrasound scan showed a defect in his gallbladder. On May 25, plaintiff had his gallbladder removed.

In November 2017, plaintiff reported that his toe was infected and not healing because of his poor circulation. In December 2017, plaintiff requested treatment for heart pain, poor circulation, pain in his ankles, numbness in his hands and feet and fatigue.

11

Martin declined to order an electrocardiogram.

OPINION

Plaintiff contends that defendants violated his Eighth Amendment rights by failing to provide him adequate medical care for his serious heart condition, ongoing chest pain and shortness of breath. Defendants have moved for summary judgment on plaintiff's claims, arguing that he cannot prove that they acted with deliberate indifference in treating his heart condition.

The Eighth Amendment's prohibition on cruel and unusual punishment prohibits prison officials from acting with "deliberate indifference" to prisoners' serious medical needs. Estelle v. Gamble, 429 U.S. 97, 103–04 (1976); Pyles v. Fahim, 771 F.3d 403, 408 (7th Cir. 2014). A prisoner may prevail on a claim under the Eighth Amendment by showing that (1) he has an objectively serious medical condition; and (2) defendants acted with deliberate indifference to that condition. Chatham v. Davis, 839 F.3d 679, 684 (7th Cir. 2016); Arnett v. Webster, 658 F.3d 742, 750 (7th Cir. 2011). The first element, an objectively serious medical condition, is one that a doctor recognizes as needing treatment or one for which the necessity of treatment would be obvious to a lay person. Pyles, 771 F.3d at 412. Defendants do not deny that plaintiff's congestive heart failure and cardiac condition are serious medical conditions.

The second element, an official's deliberate indifference, relates to the official's subjective state of mind. Perez v. Fenoglio, 792 F.3d 768, 776–77 (7th Cir. 2015); Arnett,

658 F.3d at 750. To show that a defendant acted with deliberate indifference, a plaintiff must show that the defendant knew of and disregarded a substantial risk of harm. Petties v. Carter, 836 F.3d 722, 728 (7th Cir. 2016); Gevas v. McLaughlin, 798 F.3d 475, 480 (7th Cir. 2015). A medical provider violates the Eighth Amendment if the provider administers "blatantly inappropriate" medical treatment, prescribes a course of treatment without exercising medical judgment, or prescribes treatment that the provider knows will be ineffective. Whiting v. Wexford Health Sources, Inc., 839 F.3d 658, 662–63 (7th Cir. 2016); Edwards v. Snyder, 478 F.3d 827, 831 (7th Cir. 2007). But it is not enough for a plaintiff to show that he disagrees with a defendant's conclusions about the appropriate treatment, Norfleet v. Webster, 439 F.3d 392, 396 (7th Cir. 2006), that other medical providers reached a different conclusion about what treatment to provide the plaintiff, Pyles, 771 F.3d at 409, or even that a defendant could have provided better treatment. Lee v. Young, 533 F.3d 505, 511-12 (7th Cir. 2008). Rather, plaintiff must show that any medical judgment by defendant was "so significant a departure from accepted professional standards or practices that it calls into question whether the doctor actually was exercising his professional judgment." Pyles, 771 F.3d at 409. See also Estate of Cole by Pardue v. Fromm, 94 F.3d 254, 261-62 (7th Cir. 1996).

## A. APNP Tidquist and Dr. Martin

Plaintiff contends that defendants Tidquist and Martin acted with deliberate

indifference to his serious heart condition, chest pain and shortness of breath by refusing to send him to the hospital or a specialist for treatment, hiding abnormal electrocardiogram results and persisting with ineffective treatment. However, the evidence does not support this claim.

Tidquist and Martin saw plaintiff multiple times in response to his complaints of chest pain and shortness of breath. They did not ignore his complaints. They ordered specialized testing, including x-rays, echocardiograms and electrocardiograms, and referred him to an offsite cardiologist. They prescribed multiple medications for his heart problems, and Tidquist implemented the offsite cardiologist's treatment recommendations. When plaintiff continued to complain about chest pain and breathing problems, Tidquist and Martin adjusted his medications and saw him for follow-up appointments. In July 2016, they began to explore additional possible causes for plaintiff's shortness of breath and ordered spirometry testing to assess whether plaintiff's symptoms might be caused by a pulmonary problem. After a pulmonologist assessed a mild obstructive pulmonary defect, Tidquist prescribed an inhaler that, in her judgment, would help plaintiff's breathing. In light of this treatment history, no reasonably jury could conclude that Tidquist or Martin acted with deliberate indifference to plaintiff's heart condition or symptoms.

Plaintiff argues that Tidquist and Martin should have sent him to the hospital or a specialist for treatment. He says that he had a heart attack in prison that was ignored and that he should have been offered surgery or a heart transplant. But plaintiff has no evidence that he suffered a heart attack at Jackson or that surgery or a heart transplant are medically

indicated, and his own opinion is not sufficient to sustain a constitutional claim against Tidquist and Martin. Holloway v. Delaware Cnty. Sheriff, 700 F.3d 1063, 1074 (7th Cir. 2012) (prison doctor "is free to make his own, independent medical determination as to the necessity of certain treatments or medications, so long as the determination is based on the physician's professional judgment and does not go against accepted professional standards"). The results of plaintiff's September 2016 hospitalization showed that plaintiff had not had a heart attack and had no new blockages that required treatment. Tidquist explained to plaintiff that he did not need any interventions beyond medication, and plaintiff's outside cardiologist agreed.

In sum, plaintiff has not submitted evidence showing that Tidquist's or Martin's treatment decisions were "blatantly inappropriate" or "so far afield of accepted professional standards as to raise the inference that it was not actually based on a medical judgment." Norfleet, 439 F.3d at 396. Therefore, Tidquist and Martin are entitled to summary judgment on plaintiff's claims against them.

### B. Nurses Marsolek and Kostohyz

Plaintiff alleges that Marsolek and Kostohyz violated his Eighth Amendment rights when they failed to treat his chest pains, lied about the results of his July 2016 electrocardiogram, rescinded his authorization for a wheelchair and refused to recommend sending him to the hospital. But the evidence shows that neither Marsolek nor Kostohyz ignored plaintiff's complaints. As nurses, Marsolek and Kostohyz could not prescribe

medication for plaintiff, could not refer him to a specialist and could not interpret lab and test results. But they met with him on numerous occasions, assessed him and insured that he was scheduled for follow-up appointments. Their treatment decisions were based on their medical judgment about what they thought was appropriate for plaintiff under the circumstances. In addition, plaintiff has not shown that Marsolek and Kostohyz dismissed any emergent situation or that plaintiff was harmed by their refusal to send him to the hospital on any particular occasion. Accordingly, Marsolek and Kostohyz are entitled to summary judgment on plaintiff's claims against them.

### C. Health Services Manager Maassen

Plaintiff also sued defendant Tammi Maassen, the health services manager at Jackson Correctional Institution. He alleges that on numerous occasions he sent written complaints to Maassen about the inadequate medical treatment that he was receiving. He says that she ignored his requests about his treatment and his requests for information. Maassen responds that she reviewed his complaints and his medical records and concluded that plaintiff was receiving appropriate treatment.

As discussed above, plaintiff has not shown that defendants Tidquist, Martin, Marsolek and Kostohyz denied him adequate medical treatment in violation of the Eighth Amendment. Maassen did not violate the constitution by failing to intervene when plaintiff was already receiving constitutionally adequate care. Therefore, Maassen is entitled to summary judgment as well.

16

ORDER

IT IS ORDERED that

1. The motion for summary judgment filed by defendants W. Brad Martin, Debra Tidquist, Cheryl Marsolek, Georgia Kostohyz and Tammi Maassen, dkt. #45, is GRANTED.

2. The clerk of court is directed to enter judgment for defendants and close this case.

Entered this 1st day of July, 2021.

BY THE COURT:

/s/
_____
BARBARA B. CRABB
District Judge